## Ex parte Reading

*High, Dettra & Swartz,* for petitioner; *Theodore Lane Bean,* contra.

DANNEHOWER, J., May 11, 1934.—Harry G. Ely, guardian of Ida A. Reading, a weak-minded person, filed a petition praying for leave to take against the will of his ward's deceased husband, John R. Reading, late of Huntingdon Valley, Montgomery County, Pa. The ward, Ida A. Reading, and the only child of the testator, Gladys May Ivins, joined in the prayer of the petition.

A rule was granted to show cause why the prayer of the petition should not be granted, which rule was answered by Harry B. Pierson, executor and trustee of said estate, but not by Gladys May Ivins, only child of the testator. In support of the petition and answer testimony was taken before the court and arguments of counsel heard. From the allegations contained in the petition and answer and the testimony taken, the court finds the following facts:

(1) Harry G. Ely was appointed guardian of Ida A. Reading on May 5, 1933, by this court, and duly qualified; the ward was admitted as a patient to the State Hospital, for the Insane, at Norristown, Pa., in April 1933, and was paroled on July 1, 1933, for a period of 1 year, to report monthly to the Women's Hospital at Philadelphia for treatment and observation. She returned to her home and lived with her husband until his death, and since his death has lived with her daughter Gladys in the homestead. Although she did not appear before the court at the time of the hearing on this petition, she is in fairly good health, can walk about, do housework and cook, and can confer concerning her rights and property, but the guardianship still exists.

(2) John R. Reading, husband of said ward, died October 21, 1933, leaving a

last will and testament, dated April 29, 1930, which was duly probated, wherein and whereby he appointed Harry B. Pierson executor and trustee and gave to his wife all his furniture and personal belongings. The remainder of the will reads as follows:

"ITEM III. I give, devise and bequeath all the rest, residue and remainder of my property, real and personal of whatsoever nature and wheresoever situate unto Harry B. Pierson, IN TRUST, nevertheless, to invest and keep invested and collect the income, rents, issues and profits thereof, and to pay the net income therefrom to my wife, Ida A. Reading, for and during the term of her life, and upon her death to pay said income to my daughter, Gladys May Ivins, for and during the term of her life, the payment of income made to both to be free from the interference and control of any other person whatsoever without power of anticipation or assignment by them and without any liability for their debts, contracts or engagements or for the debts, contracts or engagements of any other person or persons now or hereafter to be contracted and their receipt under their own hands shall be sufficient receipt to them for any payments by them so made. I further expressly authorize my trustee to pay out of the corpus or principal of the trust fund, during the lifetime of my wife, any sum or sums which my trustee in the exercise of his unlimited and unrestricted discretion shall deem wise for the maintenance, support and comfort of my said wife. After the death of my said wife and my said daughter, I direct that my Trustee pay over the corpus or principal of said estate to such child or children as my said daughter may leave her surviving provided, however, that the children or lineal descendants of any deceased child of my daughter, who shall survive my daughter, shall take per stirpes the share which their parent would have taken had he or she survived my daughter.

"ITEM IV. I direct that my Trustee may retain such securities as I may leave at my decease as long as he in his discretion may think best, or he may convert, change and reinvest as he thinks best and in making such reinvestments I direct that he need not be restricted to such securities as are commonly known as "trust investments", but may invest in any form of interest-bearing securities which he in the exercise of his discretion may deem proper, and he shall not be liable for any losses sustained by virtue of any investments or reinvestments, provided that he has acted in good faith.

"ITEM V. I further authorize and empower my Trustee to sell or dispose of any real estate which I may leave at my decease, wherever the same may be situate, and good and sufficient deeds therefor to make, execute and deliver to the purchaser or purchasers thereof, without any liability on the part of such purchaser or purchasers to see to the application of the purchase money.

"ITEM VI. I expressly direct that my Trustee shall have the right to sell the house and lot where I now reside at any time for such price and upon such terms as he in the exercise of his absolute discretion may deem wise, and the proceeds thereof shall become a part of the trust estate. I direct, however, that until my trustee shall determine to sell the house and lot where I now reside, he shall pay all costs of maintaining said house and lot including taxes, water rent, assessments, repairs, fire insurance and other costs of maintenance, and my wife, Ida A. Reading and after her death my daughter, Gladys May Ivins, shall be permitted to live in said residence, if they so desire, without paying rent or other charges for the privilege, and that the said cost of maintenance shall be paid out of the income of the trust estate before the balance of the income therefrom is distributed in accordance with Item III of this my Will. The right of my wife and daughter to occupy said house and lot shall terminate whenever my Trustee may deem it advisable that said house and lot be sold."

(3) John R. Reading was 82 years of age when·he died; his widow is 76 years of age; and Gladys May Ivins is the only daughter and child of the testator. She is married, of age, and has three children, one 22, another 10, and another 8 years of age, who are the only grandchildren of the testator. All the grandchildren are beneficiaries under the will and are parties in interest. None of them was served with the rule to show cause in this proceeding, nor were they present at the hearing, nor were guardians ad litem appointed for the two minor grandchildren.

(4) The widow's personal estate in the hands of her guardian consists of two mortgages in the total amount of $8,500, which, according to the testimony, are "in default with just a little loss". The annual income from her own personal estate at 6 percent would be $510.

(5) The estate of John R. Reading, deceased, consists of real estate appraised at $15,000 and personalty appraised at $32,829.04, or a total appraised value of $47,829.04. The homestead at Bethayres, Montgomery County, Pa., where the widow and the daughter and her family reside, is unincumbered and appraised at $5,000. The annual taxes are $273.14. The other real estate consists of 68 acres of farmland in Philadelphia County, which in 1926 sold for $83,000. It is unincumbered and appraised at $10,000. The annual taxes thereon are $631.07, and the annual income is $300. The real estate appraisement is very conservative. The personalty consists of eight first mortgages with a face value of $32,000 and an appraised value of $27,500. Two mortgages, amounting to $6,500, are in default and the other six, amounting to $25,500, are in good standing. The balance of the personalty consists mainly of cash and Liberty Bonds in the approximate amount of $4,500. All debts of the estate have been paid. The 1933 taxes on real estate were paid by decedent prior to his death.

The testimony does not disclose the annual income from the estate or the financial needs of the widow for her comfortable support. In the absence of such proof, we can presume what is fair and reasonable under the circumstances.

Bearing in mind the necessary expenses of settling the estate, which include the payment of executor's commissions, counsel fees, inheritance taxes, etc., we can conservatively say that the executor and trustee should have $25,500 in good first mortgages, $5,000 in cash and Liberty Bonds, and two first mortgages in default, with a face value of $6,500. The corpus of said trust would therefore be conservatively $30,000, and the annual income thereon at 5 percent would be $1,500. The annual taxes on the homestead are $273.14 and on the Philadelphia farm, $631.07, less $300 income, or a total annual tax on real estate of approximately $600.

We therefore conclude that the net annual income of the widow from the estate is $900, and in addition thereto she is provided with a homestead in which to live, with all taxes paid. Taking into consideration the annual income of $510 on her own personal estate, she would therefore have a net annual income of approximately $1,400. This does not appear to·be an unreasonable estimate, but on the contrary quite conservative, since the appraised value of the farmland is only $10,000, as contrasted with its selling price of $83,000 in 1926. The executor and trustee, who has power of sale of the real estate, under the will, in the exercise of discretion could sell the Philadelphia farmland, in which event the income of the widow would be greatly increased. It is also necessary to bear in mind that the testator expressly authorizes his trustee to pay out of the corpus of the trust fund any sum or sums which in the exercise of his unlimited and unrestricted discretion he should deem wise, for the maintenance, support, and comfort of the widow, in the event that the income should prove insufficient.

Upon the theory that the right of election is a personal right, there is no dissent from the proposition that in the absence of express statutory "authority, the guardian or commission of an incompetent cannot make an election, but such election must be made by or under the direction of a court having chancery jurisdiction over the person or estate of the incompetent: Kennedy v. Johnston, 65 Pa. 451; Crozier's Appeal, 90 Pa. 384; Arnold's Estate, 249 Pa. 348; In re Bringhurst, 250 Pa. 9; Brooke's Estate, 279 Pa. 341.

"The election of one of two things when only one can be chosen for the lunatic, is undoubtedly a judicial not a ministerial act. . . . The choice thus presented by the law is one for a judicious consideration—one of judgment to be exercised upon a view of the circumstances . . . by the court which has the care of her estate" giving due consideration to all the "advantages and disadvantages of the choice": Kennedy v. Johnston, 65 Pa. 451, 455.

The court is always bound to keep in mind the welfare of the widow. The fact that part of the property and estate of the husband will be diverted from his grandchildren should also be taken into consideration, particularly so, if what the widow receives under the will is sufficient for her comfortable maintenance and support: In re Bringhurst, supra; Miller's Estate, 9 D. & C. 657.

Here, the wife was confined to an asylum and paroled shortly before her husband's death. No doubt, he provided for her with a full understanding of the circumstances.

The factors and considerations which should enter into the decision of the court electing for or against the provisions of a will are:

1. The best interest and welfare of the afflicted widow;

2. Her personal necessities and comforts;

3. The fact of enriching the widow's personal estate and passing something to her next of kin has little place in the court's consideration;

4. The fact that a widow of weak mind knows little or nothing of the value of money and has no need for it save to furnish needs and comforts;

5. It may also be considered that, when the husband has made sufficient provision for his afflicted wife, he has an inherent right to dispose of his property as he sees fit. The court should not, in these cases, take the narrow view, to elect that property which is the most valuable. It should act for the incompetent widow as if she were a person of sound mind and actuated as a reasonable person by a desire to comply with the terms of her husband's will, so that his intentions shall not be defeated and property diverted from the channel in which the testator intended it to go.

To permit an election against the will might prove inadvisable. Its effect would be to transfer the administration of one half of the estate from one designated by the testator to the guardian, whereby the widow would be entitled to the benefit of only one half of said estate, while if the election were to take under the will the widow would have, not only the benefit of the entire net income, but also of the entire principal, if found necessary.

It seems to us that all these considerations are entitled to some weight in making the election in this case.

"In considering applications of this kind, it is the policy of the law to favor the provisions of the will and adjust the contention with judicious consideration, to be exercised in view of the circumstances": Haack's Estate, 29 Dist. R. 535, 537.

We therefore conclude that what the guardian of the afflicted widow will receive will be sufficient for her comfortable maintenance and support, considering her age and her physical and mental condition. The welfare of the widow

will therefore be fully conserved by the acceptance of the terms of the will and taking under it. Under the facts of the case, we think the prayer of the petition should be refused and petition dismissed.

And now, May 11, 1934, rule is discharged and the costs of this proceeding shall be paid out of the estate of John R. Reading, deceased.